UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOHN DOE,

                          Plaintiff,

                    -against-                              12-cv-9327 (LAK)


UNUM LIFE INSURANCE COMPANY OF AMERICA,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


        Appearances:

                Scott M. Reimer
                REIMER & ASSOCIATES LLP
                *Attorney for Plaintiff*

                Patrick W. Begos
                BEGOS BROWN & GREEN LLP
                *Attorney for Defendant*


LEWIS A. KAPLAN, *District Judge.*

        Plaintiff alleges that he wrongfully was denied long-term disability benefits by Unum

Life Insurance Company of America ("Unum") in violation of the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The matter now is before the Court

following a bench trial on a stipulated record.[1]

---

    [1]

        *See* Stip. and Order Regarding Bench Trial (Feb. 19, 2014) [DI 69].

        The stipulated record consists of Unum's claim file (Ex. A), raw test data received by Unum

I.      *Background*

Plaintiff began working in June 2006 as a partner in the financial restructuring group of a major law firm.[2]  As a benefit of employment, plaintiff was covered under the terms of the firm's long-term disability plan (the "Plan") issued by Unum.

In early 2009, plaintiff sought treatment from Dr. Eric Hollander for mild anxiety related to his firm's restructuring practice and the departure of his chief client.[3]  Plaintiff attended therapy sessions for several months and by August 2009 believed that his anxiety issues were sufficiently resolved.[4]  In October 2009, however, plaintiff's wife was diagnosed with breast cancer and they were facing serious marital problems.[5]  Plaintiff took a leave of absence from the firm to assist in his wife's treatment and to prevent, in his words, "the possible demise of my marriage."[6]

Plaintiff returned to Dr. Hollander in February 2010.  This time, Dr. Hollander noted potentially debilitating psychological symptoms and immediately commenced pharmacological

---

(Ex. B), the long-term disability plan (Ex. C), the Social Security Administration's claim file (Ex. D), and the Social Security Administration's September 16, 2013 Notice of Decision (Ex. E).  References to the stipulated record include the exhibit and bates-stamp numbers.

[2]     Ex. A at 1309.

[3]     *Id*. at 744, 1309.

[4]     *Id*. at 1310.

[5]     *Id*.

[6]     *Id*. at 420, 1310.

3

treatment.[7]  Plaintiff returned to work in March 2010 while still under Dr. Hollander's care.[8]  A few months later, however, plaintiff was informed that he was not producing significant billable hours and that he should consider alternate employment.[9]  Plaintiff acknowledged his difficulties, informed the firm of his medical problems, and stated that he would undergo neuropsychological testing and resign if the results demonstrated that he was unable to work.[10]

After undergoing psychological and neuropsychological testing, Dr. Hollander diagnosed plaintiff with major depression, obsessive compulsive disorder (OCD), attention deficit hyperactive disorder (ADHD), obsessive compulsive personality disorder (OCPD), and Asperberger's syndrome.  Dr. Hollander advised plaintiff to discontinue work on October 28, 2010, and plaintiff has not worked in any capacity since that date.[11]

---

[7]   *Id*. at 612.

[8]   *Id*. at 1311.

[9]   *Id*. at 543-44, 1298.

[10]   *Id*. at 543, 1298.

[11]   *Id*. at 612, 746, 1053-54.

4

On December 3, 2010, Plaintiff submitted a claim for long-term disability benefits under the Plan.[12]  Unum denied the claim on November 17, 2011.[13]  Unum twice denied plaintiff's appeal of that determination, and this litigation followed.[14]

## II.    Standard of Review

A beneficiary of an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan."[15]  While ERISA does not define the standard of review in such cases, the Supreme Court has held that review of a decision to deny ERISA benefits presumptively is *de novo*.[16]  Moreover, the parties have stipulated that *de novo* review applies here.[17]  Accordingly, "[u]pon *de novo* review, a

---

[12]   *Id*. at 66-93.

[13]   *Id*. at 1098-1107.

[14]   *Id*. at 1764-72, 1894-98.

[15]   29 U.S.C. § 1132(a)(1)(B).

[16]   *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (holding that a challenge to a denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator of fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan").

[17]   Stip. Regarding Standard of Review (Oct. 16, 2013) [DI 53].

district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence."[18]  In short, this Court acts as the finder of fact.[19]

The Second Circuit repeatedly has held that "as a matter of general insurance law, the insured has the burden of proving that a benefit is covered."[20]  Plaintiff therefore must prove by a preponderance of the evidence that he was "disabled" as defined by the Plan and therefore entitled to benefits.[21]

III.    *Facts*

1.    *The Plan*

The Plan defines disability as follows:

"You are disabled when Unum determines that:
- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury."[22]

---

[18]

*Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004).

[19]

*See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (recognizing the appropriateness of a bench trial "on the papers" with the district court acting as the finder of fact).

[20]

*Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002).

[21]

*See Paese v. Hartford Life & Accidence Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) ("At the outset of its analysis, [the court] clearly and correctly stated that [the claimant] has the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan." (internal quotation marks omitted)).

[22]

Ex. C. at Policy 019.

"Regular occupation" is defined as "your specialty in the practice of law which you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."[23]   Additionally, "[t]he lifetime cumulative maximum benefit period for all disabilities due to **mental illness** and disabilities based primarily on **self-reported symptoms** is 24 months."[24]

### 2.    *Duties of Plaintiff's Occupation*

The parties generally agree as to plaintiff's duties as a litigation partner with a specialty in bankruptcy law.  Unum's internal vocational rehabilitation consultant, Laura Feeney, identified, among other things, the following material and substantial duties of plaintiff's occupation: Works directly with and represents plaintiffs or defendants to bring or pursue a lawsuit, gathers evidence, conducts research, interviews clients and witnesses, prepares legal briefs, represents client in court and before quasi-judicial administrative agencies of government, generates business for firm, and supervises associates and staff.[25]  Ms. Feeney noted also that plaintiff's job demanded frequent use of short-term and long-term memory, sustained concentration and

---

[23]    *Id*. at Policy 042.

[24]    *Id*. at Policy 030.

[25]    Ex. A at 1014.

persistence, interaction with public and peers, frequent adaptations to change, and making judgments and decisions.[26]

Plaintiff underwent also a vocational assessment with Kathryn Reid, the conclusions of which were consistent with the aforementioned duties and responsibilities.[27]

### 3.    Plaintiff's Medical Records

### A.    Dr. Hollander

On January 28, 2009, plaintiff first presented to Eric M. Hollander, M.D., a board-certified psychiatrist and director of the Autism and Obsessive-Compulsive Spectrum Program at Albert Einstein College of Medicine and Montefiore Medical Center.[28]   Dr. Hollander treated plaintiff for "mild anxiety related to his firm's restructuring practice and the departure of his chief client."[29]   Treatment consisted of therapy sessions once or twice a month between January and May 2009 and one additional time in August 2009.[30]   No medication was necessary and Dr. Hollander concluded that talk therapy sufficiently resolved plaintiff's concerns.[31]

---

[26]

Id. at 1015.

[27]

Id. at 1294-1307.

[28]

Id. at 70, 1240-41, 1309.

[29]

Id. at 744.

[30]

Id. at 561 (noting plaintiff's visits to Dr. Hollander on 1/28/09, 2/23/09, 2/25/09, 3/19/09, 3/26/09, 4/16/09, 5/14/09, and 8/18/09), 744.

[31]

Id. at 612, 744, 1068.

On February 23, 2010 – more than six months after his last visit – plaintiff returned to Dr. Hollander during the leave of absence he undertook as a result of his wife's medical condition.   Dr. Hollander observed "potentially debilitating conditions, including depression, obsessive compulsive disorder (OCD), attention deficit hyperactive disorder (ADHD), and obsessive compulsive personality disorder (OCPD)."[32]   Dr. Hollander immediately prescribed Lexapro, a selective serotonin reuptake inhibitor, for the treatment of depression.[33]

On September 16, 2010, Dr. Hollander referred plaintiff to Dr. Concetta DeCaria for neuropsychological testing.[34]   Dr. Hollander concluded that the testing results confirmed "severe depression, OCD, ADHD, and OCPD and indicate[d] that [plaintiff] also has substantial and clinically meaningful cognitive deficits in executive functioning, processing speed, memory, shifting, and features of an autism spectrum disorder."[35]   Dr. Hollander then prescribed Vyvanse, a central nervous system stimulant which is indicated for the treatment of ADHD; treatment through neurocognitive support, behavior therapy, and Lexapro continued as well.[36]

On October 28, 2010, Dr. Hollander advised plaintiff to discontinue work because, in his opinion, plaintiff was unable to work full-time in his prior occupation.[37]   He reported that

---

[32]      *Id*. at 612.

[33]      *Id*. at 612, 1069, 1236.

[34]      *Id*. at 1069.

[35]      *Id*. at 612.

[36]      *Id*. at 70, 612, 1236.

[37]      *Id*. at 612, 744-45.

plaintiff spent "hours ruminating, list-making, researching, seeking validation on a specific topic" and that his "compulsion is enough to exhaust him (he often sleeps in excess of 12 hours per day)."[38] Dr. Hollander concluded as well that plaintiff could not properly regulate his behavior, remain attentive, or perform executive functions, resulting in an inability to work as a law firm partner, "which requires all of these abilities for long hours and under high stress."[39]  Dr. Hollander opined that although the "present severe and debilitating symptoms of these conditions did not emerge until 2010," plaintiff's conditions likely have been lifelong but remained latent.[40]

As of July 2012, Dr. Hollander reported that plaintiff "ha[d] made some progress through psychotherapy in accepting and understanding his conditions," but had become increasingly depressed.[41]  In fact, Dr. Hollander noted that, "[a]t times[,] [plaintiff's] lack of energy and lack of motivation render[ed] him unable to perform even basic self-care such that he require[d] supervision by his wife."[42]

### B.    Dr. DeCaria

As mentioned above, Dr. Hollander referred plaintiff to Concetta M. DeCaria, Ph.D. – a clinical neuropsychologist and assistant clinical professor of psychology at Mount Sinai School

---

[38]    *Id*. at 746.

[39]    *Id*. at 745.

[40]    *Id*. at 1237.

[41]    *Id*. at 1378.

[42]    *Id*.

of Medicine – for a psychological and neuropsychological evaluation.[43]  Dr. DeCaria's evaluation

consisted of a series of behavioral questionnaires, cognitive tests, and interviews with plaintiff and

his wife.[44]  Dr. DeCaria concluded that plaintiff exhibited superior cognitive function and scholastic

abilities, but a slow processing speed, compromised rule learning and inhibition of impulses, and

cognitive flexibility difficulties, consistent with ADHD.[45]  Moreover, plaintiff exhibited symptoms

of a personality disorder, in conjunction with prominent anger, anxiety, depressed mood, negative

self-image, and unproductive rumination.[46]  Dr. DeCaria noted that a malingering probability

assessment revealed a low likelihood of exaggerated symptom endorsement or false claims of

symptomatic distress.[47]  In the last analysis, Dr. DeCaria concluded that plaintiff's symptoms were

consistent with OCD, ADHD, depression, and OCPD, and that these symptoms worsened

significantly due to recent life stressors, such as plaintiff's wife's medical problems.[48]  Dr. DeCaria

agreed with Dr. Hollander that plaintiff could not practice law because he had a "limited capacity

for working the long hours required, managing high levels of stress, enduring prolonged periods of

focus and concentration, generating substantial preparatory work and billing, engaging in very short

---

[43]
        *Id*. at 1069, 1230.

[44]
        *Id*. at 420-28.

[45]
        *Id*. at 422-26.

[46]
        *Id*. at 425.

[47]
        *Id*. at 426.

[48]
        *Id*. at 426-27.

deadlines, [and] producing prompt action," which prevent plaintiff from generating business efforts and successes.[49]

### 4.    Unum's Reviewers

Plaintiff's claim initially was denied on the basis of a personal interview with plaintiff and file reviews by three of Unum's internal medical consultants.

### A.    Mr. Lippel

On February 16, 2011, Marc Lippel conducted a "field referral," or personal interview, to clarify certain information regarding plaintiff's medical treatment and employment.[50] Plaintiff stated that he suffered from "excessive sleeping (13-14 hours per day . . .), frequent obsessive rituals (lists, moving/shifting furniture, making purchase decisions . . . ), depression and anxiety."[51]  Plaintiff showed Mr. Lippel  some of his "ritual lists" and stated that he "would usually erase the list and redo a similar list.  His compulsive rituals are ongoing throughout the day with his thought process racing."[52]  Mr. Lippel observed that plaintiff would "ramble on and stray off topic," but that he appeared "alert, energetic, upbeat, oriented, articulate, and intelligent."[53] Additionally,

---

[49]

  *Id*. at 428.

[50]

  *Id*. at 538-59.

[51]

  *Id*. at 554.

[52]

  *Id*. at 548.

[53]

  *Id*.

Mr. Lippel stated that plaintiff did not exhibit "signs of depression or anxiety," a conclusion that appears to have been based on the fact that plaintiff did not become emotional or tearful during the interview.[54]  Finally, Mr. Lippel stated that he would "defer to medical to determine the severity of the claimant's impairments and clarify if the claimant has any barriers that preclude him from working in his occupation."[55]

<em>B.      Dr. Black</em>

F. William Black, Ph.D., a medical consultant for Unum specializing in neuropsychology, reviewed Dr. DeCaria's neuropsychological evaluation and Dr. Hollander's psychiatric treatment report.[56]  Dr. Black stated that the neuropsychological evaluation was "reasonably appropriate to the presenting problems (ADHD and personality issues)" and the "tests were appropriately administered and scored."[57]  Dr. Black concluded that "[t]he personality data is not inconsistent with the diagnoses opined by the [attending] psychiatrist and neuropsychologist" and those tests "suggest a [behavioral] condition with rather pervasive distress."[58]  However, Dr. Black opined that the self-reports of emotional symptoms were "over-endorsed," such that he

---

[54]      *Id*.

[55]      *Id*. at 558-59.

[56]      *Id*. at 642-46.

[57]      *Id*. at 644.

[58]      *Id*. at 644-45.

was unable to define the nature and degree of a behavioral condition.[59]  He therefore concluded that the test results did not warrant a conclusion that plaintiff was "not capable of performing executive functions."[60]

C.      Dr. Kletti

Nicholas B. Kletti, M.D., a medical consultant for Unum and board certified in psychiatry, also reviewed plaintiff's file.[61]  Dr. Kletti noted that Dr. Hollander "did not provide[] progress notes for review" and that there was "no documentation as to specific functional details of occupational or non-occupational performance problems."[62]  Additionally, Dr. Kletti opined that plaintiff's reports of his symptoms appeared inconsistent with his success as a high-earning attorney, which were "unnoticed by employer other than their concerns as to poor productivity at work."[63]  Dr. Kletti concluded that there was not sufficient file documentation to support psychiatric impairment.[64]

---

[59]

Id. at 645, 1028.

[60]

Id. at 645.

[61]

Id. at 682-89.

[62]

Id. at 688.

[63]

Id. at 1081; see also 688-89.

[64]

Id. at 689.

D.      Dr. Caruso

Keith A. Caruso, M.D., a medical consultant for Unum and board certified in psychiatry, concluded that "these facts are consistent with psychiatric symptoms", but the records were "not sufficiently documented as a source of a loss of ability to function in the claimant's occupational capacity."[65]   Dr. Caruso claimed that Dr. Hollander did "not provide[] standard, accepted medical evidence to support a psychiatrically impairing condition that would preclude work."[66]  Dr. Caruso opined that bi-weekly psychotherapy and treatment with Lexapro and Vyvanse "suggests a relatively mild condition."[67]  Finally, Dr. Caruso noted that most of the mental illnesses with which plaintiff recently received diagnoses would be expected to arise in adolescence and it was difficult to understand why plaintiffs' symptoms would not have been apparent earlier.[68]

5.      Administrative Appeal

A.      2012 Neuropsychological Evaluation

In 2012, plaintiff underwent a second neuropsychological evaluation, during his administrative appeal, with George J. Carnevale, Ph.D, a clinical neuropsychologist.[69]  Dr. Carnevale observed that plaintiff "has a disordered communication style and it was difficult[] at times to follow

---

[65]     *Id*. at 783.

[66]     *Id*.

[67]     *Id*.

[68]     *Id*.

[69]     *Id*. at 1197-1205.

his train of thought."[70]   Plaintiff's symptoms indicated moderate to severe depression, including

reported "indecisiveness, loss of interest in previously pleasurable activities, decreased energy,

changes in sleep pattern, irritability, concentration difficulty, and fatigue."[71] Dr. Carnevale observed

also that plaintiff suffered from "an overcompensating personality-style with obsessive compulsive

features," OCPD and ADHD.[72]   Results of the "gold standard test of possible malingering" presented

no evidence of malingering or exaggeration.[73]   Moreover, Dr. Carnevale endorsed Dr. DeCaria's

neuropsychological data as an accurate reflection of plaintiff's cognitive and psychological

functioning.[74] Dr. Carnevale concluded that plaintiff would be unable to perform complex cognitive

tasks requiring sustained mental control, divided attention, flexible problem-solving, and decision-

making, therefore precluding plaintiff from performing his occupational duties.[75]

### B.    Unum's Reviewers

In the course of plaintiff's administrative appeal, Unum sent plaintiff's file to three

additional reviewers.

---

[70]      *Id*. at 1200.

[71]      *Id*. at 1202.

[72]      *Id*. at 1202-04.

[73]      *Id*. at 1203.

[74]      *Id*.

[75]      *Id*. at 1204.

i.      *Dr. Zimmerman*

Jana Zimmerman, Ph.D., an Unum medical consultant specializing in neuropsychology, noted that several of the neuropsychological "scores related to feigning of emotional distress and psychopathology were within normal limits."[76]   Dr. Zimmerman claimed, however, that Dr. DeCaria's MMPI-2 validity scores "indicated exaggeration of psychopathology."[77]

Dr. Zimmerman noted also that plaintiff's clinical profile appeared to be "floridly symptomatic," but that his mental status was normal in an annual medical exam five days later.[78] That observation appears to have been patently inaccurate.  The report from plaintiff's annual exam with his primary care physician specifically noted that plaintiff was suffering from "obsessive compulsive personality disorder - goes to therapy" and that plaintiff was taking Lexapro.[79] Dr. Zimmerman ultimately concluded that there was no evidence of disabling impairment in plaintiff's cognitive capabilities.[80]

---

[76]        *Id*. at 1444.

[77]        *Id*.

[78]        *Id*. at 1444-45.

[79]        *Id*. at 523.

[80]        *Id*. at 1445.

*ii.    Dr. Brown*

Unum requested that Peter Brown, M.D., board certified in psychiatry, also review the evidence.[81]  Dr. Brown noted that plaintiff's treatment consisted of "low-dose psychotropic medication and psychotherapy" and that "medication treatment has been apparently limited by marked sensitivity/intolerance to . . . side effects and partial compliance."[82] Dr. Brown observed that there was an apparent "inconsistency between the claimant's previous history of academic and professional success over several decades and the assertion of a severe lifelong condition."[83] Relying on Dr. Zimmerman's report, Dr. Brown assumed that the clinical results should be understood "as the result of lack of effort."[84]  Ultimately, Dr. Brown concluded that plaintiff did not suffer from psychiatric illness resulting in functional limitations.[85]

*iii.    Dr. Delaney*

Finally, Richard C. Delaney, Ph.D., a clinical neuropsychologist and the only Unum reviewer who maintains an independent practice and does not work directly for Unum, reviewed plaintiff's claim.[86]  Dr. Delaney observed that plaintiff's neuropsychological results demonstrated

---

[81]      *Id.* at 1452-59.

[82]      *Id.* at 1458.

[83]      *Id.*

[84]      *Id.*

[85]      *Id.* at 1459.

[86]      *Id.* at 1745-52.

a very high intellectual level with low performance on very few measures.[87]  In contrast to several of Unum's internal medical consultants, Dr. Delaney did not find any evidence for malingering and concluded that plaintiff was "trying to do at least reasonably well on testing."[88]  Dr. Delaney observed consistent reports by plaintiff and corroborating impressions by his wife of "not only complaints associated with ADD[,] but features of severe depression, moderate anxiety, and features of obsessive-compulsive personality and disorder."[89]  While Dr. Delaney did not observe neuropsychological impairment, he concluded that there was evidence of a previously undiagnosed chronic personality disorder with secondary depressive reaction and features of anxiety.[90]  Dr. Delaney noted that "symptoms can wax and wane with stressors," but did not find in the record "a point at which he became impaired such that he could not function."[91]

### 6.   *Social Security Determination*

On September 16, 2013, the Social Security Administration ("SSA") notified plaintiff that his claim for disability benefits was approved.[92]  In its Notice of Decision, the ALJ noted his personal observations of plaintiff:

---

[87]

*Id*. at 1746-47.

[88]

*Id*. at 1752.

[89]

*Id*. at 1747.

[90]

*Id*. at 1747-50.

[91]

*Id*. at 1750.

[92]

*See* Ex. E.

> "At the hearing, it was very apparent that the claimant was having serious problems with his mental function consistent with the medical records.  He appeared to be having difficulty formulating his answers.  He had to look at his attorney before answering even the most fundamental of questions and his attorney had to instruct him to look at me when answering my questions.  He had a very flat affect and almost no ability to interact."[93]

The ALJ concluded that plaintiff suffers from OCD, ADHD, OCPD, major depressive disorder, and features of an autism spectrum disorder, and that he had been disabled under the terms of the SSA since October 27, 2010.[94]

*IV.    Discussion*

The stipulated record amounts to a conflict between plaintiff's treating providers and Unum's file reviewers.  Plaintiff and his providers contend that serious stressors in late-2009 – his wife's cancer diagnosis, their marriage crisis, and career difficulties – exerted a heavy psychological toll and brought to the forefront previously undiagnosed psychiatric conditions, ultimately rendering plaintiff unable to perform the material and substantial duties of his job.[95]  Unum paints a very different picture.  It claims that plaintiff exaggerated, or invented, his psychiatric symptoms when faced with the reality that he was failing at his job and would soon be terminated.[96]

Of course, the fact that plaintiff was suffering work-performance issues does not resolve whether those issues were related to plaintiff's claimed medical conditions.  It is, at least in

---

[93]

   *Id.* at SSA-343.

[94]

   *Id.* at SSA-341-343.

[95]

   *See, e.g.*, Ex. A at 744-45.

[96]

   Unum Opening Trial Br. ("Unum Br.") (under seal) at 23.

some ways, a classic chicken-or-egg problem: Did plaintiff's psychiatric conditions lead to poor business origination and a threat of termination?  Or did the threat of termination lead plaintiff to invent or exaggerate his symptoms and claimed disability?

After a careful review of the stipulated record, this Court finds that plaintiff has demonstrated by a preponderance of the evidence that he is disabled, as defined by the Plan.

This Court finds the opinions of Dr. Hollander "reliable and probative."[97] Dr. Hollander is a board-certified psychiatrist and director of the Autism and Obsessive-Compulsive Spectrum Program at Albert Einstein College of Medicine and Montefiore Medical Center.[98] Accordingly, Dr. Hollander's expertise lies in several of the specific psychiatric conditions with which he diagnosed plaintiff.  Over the course of several years of treatment, Dr. Hollander observed plaintiff's communication problems, dictatorial behavior, rigidity, and provocative action.[99]  Those observations are consistent with those of the ALJ who, after observing plaintiff at the SSA hearing, concluded that plaintiff had difficulty formulating answers and almost no ability to interact.[100]  Moreover, plaintiff consistently complained to Dr. Hollander of compulsive list-writing, resulting

---

[97]

*Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 442 (recognizing that a court may evaluate and give appropriate weight to a treating physician's conclusions if it finds the opinions reliable and probative).

[98]

Ex. A at 70, 1240-41, 1309.

[99]

*Id*. at 1069-70.

[100]

Ex. E at SSA-343.

in "losing days."[101]  Those reports are corroborated by plaintiff's interview with Mr. Lippel, who noted that he observed some of plaintiff's "ritual lists."[102]

    While it is true that much of the information Dr. Hollander relied on was presented to him by plaintiff's subjective report of his symptoms, that is an important source of evidence in determining disability.[103]  Dr. Hollander's conclusions are corroborated by other sources as well. Specifically, the neuropsychological testing demonstrated symptoms consistent with a personality disorder in conjunction with prominent anger, anxiety, depressed mood, negative self-image, and unproductive rumination.[104]  Dr. DeCaria concluded that plaintiff's symptoms were consistent with OCD, ADHD, depression, and OCPD.[105]  Similarly, Dr. Carnevale observed that plaintiff suffered from "an overcompensating personality-style with obsessive compulsive features," OCPD and ADHD.[106]

    Unum makes three principal arguments to support its decision to deny plaintiff's long-term disability benefits.

---

[101]
   Ex. A at 1069.

[102]
   *Id*. at 548.

[103]
   *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) ("[S]ubjective complaints of disabling conditions are not merely evidence of a disability, but are an important factor to be considered in determining disability." (internal quotation marks omitted)).

[104]
   Ex. A at 426.

[105]
   *Id*. at 426-27.

[106]
   *Id*. at 1202-04.

*First*, Unum contends that plaintiff's highly successful legal career undercuts his diagnoses because these illnesses typically (or must) begin in adolescence or early adulthood.[107] In other words, Unum and its medical reviewers question the likelihood that plaintiff could have functioned as a highly successful lawyer for many years without anyone noticing that he suffered from ADHD, OCD, or OCPD.   Nevertheless, it seems entirely possible that someone with superior intelligence could excel in school and in a career for quite some time despite inattentiveness or hyperactive-impulsive symptoms.   And Dr. DeCaria noted that, at least for a time, plaintiff's "compulsive style ha[d] been an asset to his academic and vocational development."[108] Additionally, Unum's own medical reviewer, Dr. Delaney, concluded that plaintiff suffers from a previously undiagnosed chronic personality disorder.[109]   Accordingly, this Court credits Dr. Hollander's opinion that plaintiff's conditions likely have been lifelong but remained latent until his debilitating symptoms emerged in 2010.[110]

*Second*, Unum criticizes Dr. Hollander for providing a summary of plaintiff's treatment instead of the complete office visit notes.[111]  It appears that Unum's psychiatric consultants – Drs. Kletti, Caruso, and Brown – based their conclusions, at least in part, on the fact that they had

---

[107]     Unum Br. at 20-21.

[108]     Ex. A at 420.

[109]     *Id*. at 1747-50.

[110]     *Id*. at 1237.

[111]     Unum Br. at 21-22.

not received such documentation.[112] But this is a problem of Unum's own making.  On February 25, 2011, Unum wrote to plaintiff and stated the following: "If Dr. Hollander will not be providing us copies of your medical records, we will require a summary of care letter from Dr. Hollander which will need to include the dates you received treatment . . . and the conditions for you which you received treatment for on each appointment date."[113]  In short, Unum agreed to accept a summary of care letter in lieu of the original medical records, but then justified its decision to deny plaintiff's benefits, at least in part, on the ground that Dr. Hollander did not provide those medical records. Such a tactic is petty, if not blatantly deceptive.  Moreover, this Court has received more than sufficient documentation from Dr. Hollander to credit his medical opinion.[114]

*Third*, Unum claims that the neuropsychological testing did not provide evidence of plaintiff's disability.[115]  This argument rests on the opinions of Unum's own medical consultants who suggested that plaintiff was exaggerating his symptoms or possibly malingering.  Dr. Black, for example, concluded that "[t]he personality data appears to reflect an over-endorsement of emotional distress," rendering it "impossible to clearly define the nature and degree" of plaintiff's condition.[116] Dr. Zimmerman similarly observed that the "validity scores indicated exaggeration of

---

[112]

       *See* Ex. A at 688 (Dr. Kletti noted a lack of documentation for Dr. Hollander's conclusions); *id*. at 783 (Dr. Caruso concluded that Dr. Hollander "has not provided standard, accepted medical evidence to support a psychiatrically impairing condition that would preclude work").

[113]

       Ex. A at 582.

[114]

       *Id*. at 70-71, 612, 744-47, 1068-71, 1235-39, 1377-78.

[115]

       Unum Br. at 23.

[116]

       Ex. A at 644-45.

psychopathology" and claimed a "need to rule out possible malingered neurocognitive dysfunction."[117]  But Unum's only relatively independent medical reviewer, Dr. Delaney, concluded just the opposite.  He stated that there "[wa]s no evidence for malingering" and that, in his opinion, plaintiff "was generally trying to do at least reasonably well on testing."[118]  Dr. Delaney ultimately concluded that the personality tests were valid.[119]  His opinion is consistent with those of Drs. DeCaria and Carnevale, who separately concluded – based on objective tests designed to identify exaggeration – that the personality results reflected psychopathologically significant clinical findings, rather than malingering.[120]  Accordingly, the neuropsychological results are valid.

The Court has reviewed each of Unum's other arguments and finds them to be without merit.  In the last analysis, this Court credits Dr. Hollander's opinion that plaintiff is suffering from psychiatric conditions and that he is unable to properly regulate his behavior, remain attentive, or perform executive functions, resulting in an inability to work as a litigation partner with a specialty in bankruptcy law.[121]  Moreover, there is no genuine dispute that plaintiff has had a loss of 20 percent or more of his indexed monthly earnings, as he has not worked since October 28, 2010.[122]

---

[117]
    *Id*. at 1444-45.

[118]
    *Id*. at 1752.

[119]
    *Id*.

[120]
    *Id*. at 426, 798, 1203.

[121]
    *Id*. at 745.

[122]
    *See* Ex. E at 341, 1053-54.

*Conclusion*

The foregoing constitute the Court's findings of fact and conclusions of law.  This Court concludes that plaintiff has met his burden to show that he is disabled under the Plan.  Settle judgment on notice.

SO ORDERED.

Dated:      July 9, 2015

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)